UNION CARBIDE CORPORATION, Individually and on Behalf of and as the Successor in Interest of Seadrift Polypropylene Company, Plaintiff,

v.

MONTELL N.V.; Montell Polyolefins; Montell North America Inc.; Montell USA Inc.; Technipol S.r.L.; Montedison S.p.A.; Montell Finance USA, Inc.; Royal Dutch Petroleum Company; The Shell Transport and Trading Company, p.l.c.; Shell Petroleum N.V.; The Shell Petroleum Company Ltd.; Shell Petroleum Inc.; Shell Oil Company; Shell Polypropylene Company; Shell Canada Ltd.; Shell International Chemical Company Ltd.; and Shell Internationale Research Maatschappij B.V., Defendants.

No. 95 Civ. 0134 (SAS).

United States District Court, S.D. New York.

Aug. 30, 1996.

John Herfort, Mike Denger, DC Office, Gibson, Dunn & Crutcher, New York City, for Plaintiff Union Carbide.

William C. Pelster, Skadden, Arps, Slate, Meagher & Flom, New York City, for Defendants Montedison and Technipol.

Rory Millson, Cravath, Swaine & Moore, New York City, for Defendants Shell/Montell.

Steven M. Edwards, Baker & Botts, New York City, for Defendants Shell Oil Co./Shell Polypropylene Co.

### OPINION AND ORDER

SCHEINDLIN, District Judge:

Plaintiff Union Carbide Corporation ("UCC"), both individually and as successor in interest to and on behalf of Seadrift Polypropylene Company ("Seadrift"), has sued 17 defendants on various grounds. Generally, the Complaint[1] alleges violations of the antitrust laws, as well as various common law claims relating to certain defendants' alleged breach of agreements between them and UCC. The defendants are aligned in three groups, and each group has moved to dismiss portions of the Complaint. The groups are as follows. "Shell/Montell" refers to defendants Montell N.V.; Montell Polyolefins; Montell North America Inc.; Montell USA Inc.; and Montell Finance USA, Inc. (the "Montell" defendants), as well as Royal Dutch Petroleum Company; The Shell Transport and Trading Company, p.l.c.; Shell Petroleum N.V.; The Shell Petroleum Company Ltd.; Shell Petroleum Inc.; Shell International Chemical Company Ltd.; Shell Internationale Research Maatschappij B.V. ("SIRM"); and Shell Canada Ltd. (the "Shell" defendants). The Shell/Montell defendants submitted joint briefs on the motion. Shell Oil Company ("SOC") and Shell Polypropylene Company ("SPC") joined in the briefing of this motion. Finally, defendants Montedison S.p.A. ("Montedison") and Technipol S.r.L. ("Technipol") submitted joint briefs. The relationships among these companies are detailed in ¶¶ 7–24 of the

Complaint. This Opinion addresses these relationships only to the extent necessary to resolve the motions to dismiss.

### I. Standard for Deciding a Motion Under Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim, "the Court's function is merely to assess the legal sufficiency of the complaint rather than to weigh the evidence that might be presented at a trial." *Reich v. Glasser*, 95 Civ. 8288, 1996 WL 243243, at *1 (S.D.N.Y. May 10, 1996) (citing *Festa v. Local 3 Int'l Bhd. of Elec. Workers*, 905 F.2d 35, 37 (2d Cir.1990)). Therefore, the Court must accept as true the factual allegations contained in the complaint. *See Cohen v. Koenig*, 25 F.3d 1168, 1171 (2d Cir.1994). All reasonable inferences must be drawn in favor of the non-moving party on such a motion. *See Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### II. Facts

The following recitation of relevant facts is drawn from UCC's Third Amended Complaint. The absence of the phrase "UCC alleges" at the outset of each paragraph should not be taken as any indication that the Court endorses or adopts the facts set forth herein.

#### A. Polypropylene and Polypropylene Technology

Polypropylene is a polymer plastic used in a variety of commercial applications, including caps and closures for bottles, appliances, automotive parts, toys, fibers and filaments, and film. Cplt. ¶ 25. Two kinds of complex technology are required to produce the polypropylene: (1) "Process technology" which is necessary to design and use the equipment in

---

1. "Complaint" refers to UCC's Third Amended Complaint, filed on January 18, 1996. If reference is made to a prior complaint, the full title will be used (*i.e.*, Original Complaint, First Amended Complaint, Second Amended Complaint).

which the chemical transactions take place; and (2) "catalyst use technology" which is necessary to use the specific catalysts to produce the polypropylene resin for specific end-uses. *Id.* ¶ 26.

Historically, only a small number of firms have developed polypropylene process technology, polypropylene catalysts, or related catalyst use technology. There are significant barriers to entry into these lines of business, including the complexity of the various technologies involved, certain patent barriers, and substantial research and development costs, all of which involve significant sunk costs. Many producers of polypropylene do not have their own proprietary process and catalyst technology, and must obtain by license the technology necessary to manufacture polypropylene. *Id.* ¶ 28.

### B. *The Development of Current Generation Process and Catalyst Technology*

Since 1975, the polypropylene process and catalyst technologies have improved significantly. The most recent development, "Current Generation Process and Catalyst Technology," is more efficient and less costly per unit of output than earlier technologies and requires less equipment and capital expenditure by the resin manufacturer. Cplt. ¶ 29. Companies who wish to construct and operate new polypropylene resin plants ordinarily have no economically feasible alternative but to enter into a "Total Package License" for all of the elements necessary to manufacture polypropylene (including Current Generation Catalyst and Process Technology, plant design, and rights to purchase and use Current Generation Polypropylene Catalysts). Thus, there is no longer a demand for separate process and catalyst technology licenses for new plants. *Id.* ¶ 30.

Montedison and Mitsui Petrochemical Industries, Ltd. ("Mitsui") were the first firms to develop, commercialize, and license a Current Generation Catalyst and Process Technology. *Id.* ¶¶ 31–33. As of the 1980s, no other prospective licensor had developed both a Current Generation Catalyst and a Current Generation Process Technology. *Id.* ¶ 33. Although UCC had developed a Current Generation Process Technology called

UNIPOL, it needed to possess a Current Generation Catalyst in order to successfully enter the polypropylene technology licensing business. *Id.* ¶ 35. After considering the lengthy period it would take to develop a Current Generation Catalyst and related technology, UCC decided to seek a co-venturer that already possessed a Current Generation Catalyst and associated catalyst technology that could be adapted to function with UCC's UNIPOL process technology. *Id.* ¶ 38. Likely candidates included Hercules, Inc., Stauffer Chemical Company ("Stauffer"), and Shell Oil Company ("SOC"). *Id.* ¶ 34. Mitsui was effectively eliminated as a possible catalyst co-venturer because of a prior research and development agreement it had made with Montedison. *Id.* ¶ 31.

### C. *Montedison's Efforts To Maintain Its Dominant Position In the Licensing of Current Generation Technology*

In an attempt to acquire and maintain a dominant position in the licensing of Current Generation Catalyst and Process Technology, Montedison took various actions that effectively eliminated some of the most likely catalyst partners for UCC. Cplt. ¶ 40. For example, in August 1982, UCC and Hercules agreed to establish a program that would permit the parties to evaluate the compatibility of Hercules' Current Generation Catalyst and catalyst use technology. *Id.* ¶ 41. However, in 1983, Hercules and Montedison formed a company called Himont, and shortly thereafter, Hercules discontinued work under the UCC catalyst evaluation agreement because of a likely competitive conflict with Himont. *Id.* ¶¶ 42–43.

A similar fate met UCC's joint development discussion with Stauffer. In 1984, Himont, Mitsui, and Stauffer entered into an agreement for the stated purpose of resolving possible patent infringement issues relating to polypropylene catalysts. *Id.* ¶ 47. After entering into this agreement, Stauffer stopped developing and attempting to market its own Current Generation Catalyst and terminated its joint development discussions with UCC. *Id.* ¶ 48.

### D. *SOC's Venture with UCC*

In December 1981, UCC and SOC entered into a confidential polypropylene catalyst evaluation agreement, similar to those that UCC had entered into with Hercules and Stauffer. Cplt. ¶ 49. In December 1983, UCC entered into a long-term cooperative arrangement with SOC (the "UCC/Shell Venture") for the commercial development and licensing of Total Package Licenses to third parties that would include UCC's UNIPOL Current Generation Process Technology and SOC's SHAC Current Generation Catalyst. *Id.* ¶ 50. The parties also formed a partnership under Texas law, Seadrift Polypropylene Company ("Seadrift"), in order to construct, own and operate a world-scale demonstration polypropylene resin plant (the "Seadrift plant"). *Id.* ¶¶ 51, 64.

UCC and SOC entered into a number of related agreements in the course of establishing and operating the UCC/Shell Venture. These agreements include (1) the Cooperative Undertaking Agreement ("CUA"), (2) the Seadrift Partnership Agreement, (3) the Catalyst Sales Contract, and (4) the Polypropylene Conversion Agreement. *Id.* ¶ 53.

The CUA represents the basic agreement defining the duties and obligations of UCC and SOC with respect to the UCC/Shell Venture, particularly with regard to provisions protecting trade secrets both while the CUA is in effect and after termination or expiration of the CUA. *Id.* ¶ 54. Part of the CUA calls for SOC to provide catalysts to the partnership for production of polypropylene resin at the Seadrift plant at "cost plus a reasonable return on capital." *Id.* ¶ 56 (citing CUA). The CUA also provides that if SOC terminates the agreement, SOC "will not for a period of ten (10) years after termination undertake alone or with any third party the development of a gas phase fluid bed process for the manufacture of PP Resin or polyethylene." *Id.* ¶ 62(d) (citing CUA).

The Seadrift Partnership Agreement embodies the terms of the UCC/Shell partnership to construct, own and operate the Seadrift plant. *Id.* ¶ 64. The Catalyst Sales Contract formalizes SOC's rights and obligations in regard to its provision of catalysts to the Seadrift plant for use in producing po-lypropylene. *Id.* ¶ 66. SOC also entered into the Polypropylene Conversion Agreement (also known as the "Toll Conversion Agreement") to formalize SOC's rights and obligations regarding the marketing and sale of polypropylene resin manufactured at the Seadrift plant. *Id.* ¶ 68.

### E. *Montedison's and Himont's Efforts to Curtail Total Package Licensing Competition From the UCC/Shell Venture*

In 1985, when UCC and SOC began to market the UCC/Shell Commercial Process and Total Package License in competition with Himont and Mitsui, UCC and SOC encountered significant difficulties as a result of Montedison's and Himont's conduct. In 1985 and 1986, Montedison, Himont and Mitsui threatened to sue SOC and its licensees for patent infringement, which deterred a number of potential licensees from using the UCC/Shell Venture's Current Generation Process and Catalyst Technology and delayed for almost two years the effective entry of the UCC/Shell Venture into the Total Package Licensing Business. Cplt. ¶ 70.

UCC (with the backing of SOC) informed Himont, Montedison and Mitsui that it was considering litigation challenging their actions under the antitrust laws of the United States. Thereafter, Himont, Montedison, and Mitsui entered into negotiations with UCC and SOC in an effort to resolve the dispute. The parties ultimately executed a settlement agreement whereby UCC agreed to waive its right to bring an antitrust action against Himont, Montedison and others in return for their dropping patent claims against the manufacture, use, and licensing of the SHAC catalyst. UCC also provided Himont with a nominal royalty on polypropylene resin sales by UCC/Shell Venture licensees. *Id.* ¶ 71.

### F. *The Success of the UCC/Shell Venture in Restraining Himont's Dominance of the Total Package License Market*

The December 1986 settlement enabled the UCC/Shell Venture to enter the Total Package License Market successfully. In

that market, the Venture has been the principal worldwide competitor of Montedison. From January 1987 to December 1993, the UCC/Shell Venture obtained approximately 36% of all Total Package Licenses entered into worldwide with independent third-party licensees. During the same time period, Himont obtained approximately 41% of such licenses. Cplt. ¶¶ 74–75.

G. *Catalyst Research and License Agreement with SIRM, and RDS' Plans to Expand its Polypropylene Resin Production Capacity with UNIPOL Technology*

In January 1988, UCC, SOC and SIRM (the research organization owned by the RDS Group) entered into a tripartite research agreement pursuant to which the parties agreed to cross-license the fruits of their catalyst technology research. Cplt. ¶¶ 76–77. One month later, UCC and SIRM entered into a Polypropylene License Agreement. Under this agreement, UCC granted SIRM a non-exclusive license to use the UCC/Shell Commercial Process and allowed SIRM to extend that right to use and disclose the commercial process to other RDS Group companies (the "RDS license"). *Id.* ¶ 78. During negotiations regarding the RDS license, RDS told UCC it intended to use UNIPOL in all new RDS impact co-polymer plants. *Id.* From 1987 through mid–1991, RDS conducted a number of polypropylene strategy reviews that recommended using UNIPOL in specific new RDS plants. *Id.* ¶¶ 80–81.

H. *Efforts to Expand the UCC/Shell Venture*

As of early 1990, the Seadrift plant had been operating for four years, but its production capacity was limited to 90,000 metric tons. SOC had disposed of its Woodbury, New Jersey manufacturing plant in the late 1980s. As a result, its only remaining polypropylene production capacity was its half

interest in the Seadrift plant and its Norco plant (production capacity: 135,000 metric tons). Cplt. ¶ 84. UCC and SOC recognized that they needed direct involvement with the polypropylene resin market in order to be competitive. They also realized that the revenues earned from catalyst production and licensing alone could not support the research and development necessary to maintain a competitive edge. *Id.* ¶ 85.

RDS, meanwhile, had also recognized that the UCC/Shell Venture required more investment in research and development, as well as in polypropylene resin production capacity, to remain competitive. RDS was concerned that the UCC/Shell Venture's licensed technology was vulnerable in the long run because UCC and SOC did not have extensive first-hand experience in the polypropylene market. *Id.* ¶ 86. In response to these forecasts, SOC embarked upon a new strategy in 1989 to increase polypropylene production. SOC intended to become a "top tier" player in the North American polypropylene resin market by the mid–1990s. *Id.* ¶ 87.

In furtherance of this goal, UCC and SOC planned an expanded joint venture, which UCC referred to as "Nautilus." Under the proposal, each party was to contribute capital and services in order to achieve a 50/50 interest in the new venture.[2] SOC and UCC also planned to contribute additional capital sufficient to allow the construction of two major UNIPOL polypropylene plants with 200,000 metric tons of capacity each by the mid–1990s, in time to meet the next high cycle in North American polypropylene demand. *Id.* ¶ 88. As part of this proposed expanded venture, on March 12, 1990, SOC and UCC entered into a six-month Disclosure and Secrecy Agreement that enabled the parties to exchange confidential information. Over the next six months, the parties exchanged proposals addressing various issues relating to

---

2. Under the proposed project, UCC and SOC would both contribute their existing half interest in the UCC/Shell Venture and the Seadrift plant; SOC would contribute its Norco polypropylene resin plant and its SHAC catalyst business; UCC

would contribute its supporting training and engineering services business; and UCC and SOC would contribute capital in appropriate amounts to achieve a 50/50 interest. Cplt. ¶ 88.

Nautilus, and began exchanging drafts of the documents necessary to establish the venture.[3] *Id.* ¶ 89. On September 13, 1990, SOC and UCC extended the Disclosure and Secrecy Agreement until March 12, 1991, and continued to meet and exchange information regarding Nautilus. *Id.* ¶ 90.

Meanwhile, Shell Canada was also reassessing its polypropylene resin strategy, and concluded that it would be in a good position to service the northeastern United States if it could manage to build a new low-cost UNIPOL plant. *Id.* ¶ 91. In March 1991, during discussions between SOC and Shell Canada, a Shell Plastics Business Center executive indicated that the expanded UCC/Shell Venture could provide an avenue for equity participation by Shell Canada, as well as an alternative means for Shell Canada to obtain UNIPOL technology. *Id.* ¶ 92. On March 14, 1991, SOC and UCC extended the Nautilus Disclosure and Secrecy agreement for an additional six months. On May 14, SOC and UCC agreed to extend the coverage of their secrecy agreement to permit SOC to disclose to Shell Canada confidential information from UCC. *Id.* ¶¶ 92–93.

In April 1991, the chief SOC negotiator for the Nautilus project reported in a status update to SOC executives that progress was being made toward resolving the remaining key issues. *Id.* ¶ 93. However, in June 1991, while the Nautilus negotiations were proceeding, a senior SOC executive notified a senior UCC executive that Montedison had approached RDS and SOC about a worldwide RDS/Himont joint venture and that both RDS and SOC were interested. SOC stated that because of Montedison's expressed interest, it wanted to suspend the Nautilus negotiations for a few months. In spite of SOC's unilateral suspension of the Nautilus discussions, on June 27, 1991, UCC reaffirmed to SOC that UCC was still very interested in Nautilus. *Id.* ¶ 94.

### I. *Montedison's Scheme to Eliminate Competition from the UCC/Shell Venture*

#### 1. *Montedison's Situation as of June 1991*

Before Montedison approached SOC, Montedison's Himont subsidiary was the leading polypropylene manufacturer in the world. Cplt. ¶ 95. However, due to a low cycle in the industry in the early 1990s, Montedison faced financial difficulties and a shrinking worldwide market for polypropylene resin. *Id.* ¶ 97. The proposed UCC/Shell Venture licensing program threatened to jeopardize Montedison's commercial advantage by introducing the Current Generation Process and Catalyst Technology into competitors' polypropylene production facilities. *Id.* Montedison hired two consulting firms in 1990 whose findings concluded that UCC's aggressive licensing practices posed a serious threat to Himont's interests in polypropylene production. *Id.* ¶¶ 99–104.

#### 2. *Initial Discussions of Project Sophia*

Montedison initially sought to disrupt the UCC/Shell Venture by inducing UCC to align with Montedison. Cplt. ¶ 106. After UCC rejected Montedison's approach, but before SOC suspended the Nautilus negotiations, Montedison contacted RDS and SOC about a worldwide venture in which they would combine their respective polyolefins businesses. *Id.* Beginning in July 1991, representatives of RDS, SOC and Montedison began to discuss a possible venture, referred to as the "Sophia" project. *Id.* ¶ 107. SOC allegedly told Montedison about its business venture with UCC, as well as the Nautilus proposal. *Id.* ¶ 109. In December 1991, a subsidiary of RDS, a subsidiary of Montedison, and SOC entered into a Letter of Intent and Secrecy Agreement in connection with Sophia. The existence of this agreement was not disclosed to UCC. As a result of the Sophia discussions, SOC notified UCC that it was terminating the Nautilus discussions in December 1991. *Id.* ¶ 110.

---

**3.** The parties also increased their research and development expenditures supporting the UCC/Shell venture by approximately 30%, anticipating that Nautilus would become a reality. UCC also prepared cost estimates for constructing the new polypropylene plants, and SOC informed polypropylene resin customers that it was considering an expansion of the UCC/Shell Venture's polypropylene manufacturing capacity. Cplt. ¶ 89.

3. *SOC, Shell Canada and RDS Termination of Expanded UNIPOL Relationship, and SOC's Actions to Terminate the CUA and Join Montell*

On July 30, 1992, SOC, RDS and Montedison entered into a Memorandum of Understanding regarding the "partial merger" of their worldwide polyolefins business into the Sophia venture.[4] Cplt. ¶ 118. The parties entered into this understanding in spite of a substantial risk of antitrust violations in both Europe and the United States. *Id.* ¶¶ 116–117. UCC was not informed of the existence of this Memorandum between SOC, RDS and Montedison. *Id.* ¶ 118.

UCC finally became aware of a possible venture between SOC, RDS and Montedison via a letter from SOC dated August 5, 1992. *Id.* ¶ 119. SOC's letter indicated a desire to negotiate with UCC regarding the termination of the CUA. SOC suggested modifying the CUA to give SOC an option to terminate the agreement so that it could participate in the joint venture between RDS and Montedison without incurring the obligations the CUA's termination provisions would impose. *Id.* Believing that SOC's proposal would leave UCC in a substantially weaker position in the market than if the venture were continued, UCC rejected SOC's proposal. *Id.* ¶ 123.

4. *The RDS/Montedison Announcement of a Memorandum of Understanding*

On September 17, 1992, while SOC was attempting to disentangle itself from the CUA, RDS and Montedison announced that they had signed a Memorandum of Understanding to evaluate worldwide integration of their polyolefins businesses. Cplt. ¶ 124. On the same day, SOC issued a news release announcing that the proposed RDS/Montedison enterprise would not include the UCC/Shell Venture, and that SOC's obligations under the UCC/Shell Venture would remain unchanged. SOC still did not disclose to UCC that SOC had signed the Memorandum of Understanding announced by Montedison

and RDS. *Id.* In March 1993, after holding discussions aimed at reassuring the UCC/Shell Venture's licensees that SOC would honor its obligations, SOC issued a "Holding Statement," restating its commitment to the UNIPOL technology and to UCC/Shell licensees. *Id.* ¶ 125.

5. *The Montell Scheme as Originally Announced, and as Modified to Meet EC Concerns*

Nine months later, in December 1993, RDS and Montedison announced that they had signed an agreement to combine major portions of their polyethylene and polypropylene business into a joint venture company, which was later named "Montell." Cplt. ¶ 126. Under the agreement, RDS would own 100 percent of SOC and would have control over Montell. In sum, the venture contemplated RDS controlling the two leading competitors in the licensing of Total Package Licenses and in catalyst research and development. *Id.* ¶ 127. This structure was opposed by the European Community (EC). In response, RDS and Montedison proposed in the Spring of 1994 that the UCC/Shell Venture be dissolved to resolve competitive concerns. However, SOC and UCC were unable to negotiate a resolution. In May 1994, RDS and Montedison offered to form a separate entity, known as "Technipol," to license Montedison's Current Generation Catalyst and Process Technology (Spheripol) to third parties. These licenses would be offered in competition with the UNIPOL/SHAC licenses offered by the UCC/Shell Venture. *Id.* ¶ 128.

6. *The Montell Scheme as Modified by the Proposed FTC Consent Order*

On January 11, 1995, the FTC proposed a Consent Order, pursuant to which SOC would have at least six months to divest its polypropylene assets to UCC or an independent party. Cplt. ¶ 129. Further, during the period prior to divestiture, SOC was required to form a separate subsidiary, free from SOC's control, to own and operate the

---

**4.** This Memorandum contemplated the formation of Sophia on January 1, 1993. SOC would contribute its solely-owned polypropylene assets, including its Norco polypropylene resin plant and its SHAC–II catalyst plant then under construc-

tion. SOC would also contribute its propylene manufacturing assets and/or propylene purchase arrangements. Further, Shell Canada was to contribute its Sarnia, Ontario polypropylene plant. Cplt. ¶ 118.

SOC polypropylene assets to be divested. In response, SOC formed Shell Polypropylene Company (SPC), and on February 28, 1995, SOC transferred its polypropylene-related businesses (and purported to assign its rights to and obligations under the CUA) to SPC. Montell became operational on March 31, 1995. *Id.* ¶ 130.

### J. Actions by SOC and RDS to Weaken Competition Involving the UNIPOL/SHAC Technology

In addition, SOC took other actions which weakened competition in the Total Package License market. For example, in violation of the CUA, SOC attempted to establish a separate business for the recycling of titanium tetrachloride, a by-product of catalyst production. The result was that SOC allegedly received a return on its capital far in excess of the reasonable return agreed to in the CUA. Cplt. ¶¶ 136–42.

In the Summer of 1993, SOC intentionally reduced the productivity of certain catalysts, including SHAC 201, in order to increase its revenues and profits from catalyst sales. Because catalyst yields have improved, licensees can purchase smaller quantities of catalyst to produce the same amount of polypropylene. However, by reducing the productivity of the catalyst, SOC forced licensees to continue to purchase the same amount of catalyst, in violation of its contractual obligations under the CUA to make technological advances available to licensees. *Id.* ¶ 143. Among UCC's other claims are allegations that SOC reduced its portion of research and development expenditures, increased the price of the SHAC catalyst, and refused to build a new polypropylene plant, all in violation of the CUA. *Id.* ¶¶ 144–146.

### K. SOC's Support of Sophia After It Announced It Could Not Participate in Sophia

SOC continued to support the Sophia project even after it announced that it would not participate in the venture. Cplt. ¶ 147. SOC undermined the UCC/Shell Venture by publicly professing before the EC that SOC was a neutral observer of the Montell merger, even though SOC's internal assessments of the RDS/Montedison venture indicated otherwise. *Id.* ¶ 152. SOC also actively cooperated with Montedison and RDS in order to help the Montell venture go forward. *Id.* ¶ 151.

Finally, SOC continually subordinated its own interests to those of RDS throughout the events in question. By entering into the FTC Consent Order, which obligated SOC to divest itself of its entire polypropylene business, SOC allowed Montell to penetrate the United States polypropylene market—a market which had traditionally been the exclusive province of SOC under a long-standing protocol between SOC and RDS. *Id.* ¶¶ 153–154. SOC did so at a favorable time in the polypropylene business cycle, even though just several years earlier it had sought to become a "top-tier" polypropylene player. *Id.* ¶ 154.

### L. Events Following Entry of the FTC Consent Order

After filing its Original Complaint on January 9, 1995, UCC made a motion for a preliminary injunction. That motion was withdrawn on February 22, 1995 when the parties reached a settlement agreement. Under that agreement, an independent third party would appraise the value of the assets of SPC, and UCC would then have the opportunity to purchase those assets at a price derived from the fair market value as computed by the appraiser. The appraiser rendered its estimate on April 28, 1995, and on May 5, UCC gave notice that it would purchase SPC's assets. On June 21, 1995, after further submissions by the parties, the appraiser revised its estimate. On June 28, UCC gave notice that it would purchase SPC's assets at a price derived from the revised estimate of fair market value. When UCC and SOC entered into a definitive agreement for UCC to purchase the assets of SPC, they submitted the agreement to the FTC for approval. The FTC approved the sale on December 21, 1995. Cplt. ¶¶ 156–60.

Following its purchase of the assets of SPC, UCC again amended its complaint to incorporate these new allegations. Defendants have moved to dismiss almost all of this Third Amended Complaint.

**III.** *Count II: Breach of Fiduciary Duty by SOC and SPC*

■ In Count II, UCC alleges that SOC breached the fiduciary duty it owed to UCC.[5] UCC alleges that a fiduciary relationship between SOC and UCC arose by virtue of the Seadrift Partnership Agreement between the two entities, as well as by virtue of the Cooperative Undertaking Agreement. Cplt. ¶¶ 229–30. UCC incorporated both of these agreements by reference into its Complaint. Cplt. ¶ 53. According to UCC, "[SOC] breached its fiduciary duty to UCC by breaching the CUA, the Catalyst Sales Contract, and the Polypropylene Conversion Agreement, and by actively cooperating in the efforts of the other defendants to establish businesses aimed at undermining the competitive efforts of UCC in the UCC/Shell Venture." Cplt. ¶ 232.

■ SOC argues for dismissal of this Count on the ground that the CUA did not create a fiduciary relationship between UCC and SOC. While Article 13 of the CUA provides in part that "this Agreement does not create a partnership or joint venture between the parties," the parties agree that the CUA does not expressly state that no fiduciary duty exists between UCC and SOC. SOC/SPC Reply Mem. at 2; UCC Opp.Mem. (SOC/SPC) at 1.[6] In any event, "[s]tatements that no partnership is intended are not conclusive. If as a whole a contract contemplates a[n] association of two or more persons to carry on as co-owners a business for profit, a partnership there is." *Martin v. Peyton*, 246 N.Y. 213, 217, 158 N.E. 77

(1927). Factors to consider in determining whether a joint venture exists are: "(1) the intent of the parties to form a joint enterprise; (2) joint control and management of the business; (3) a sharing of profits and losses; and (4) a combination of property, skill or knowledge." *Sound Video Unlimited, Inc. v. Video Shack Inc.*, 700 F.Supp. 127, 138 (S.D.N.Y.1988) (citing *Halloran v. Ohlmeyer Communications Co.*, 618 F.Supp. 1214, 1218 (S.D.N.Y.1985)).

Proceeding, as I must, on the assumption that UCC's allegations are true, UCC could conceivably prove a set of facts that would entitle it to relief. *See* Cplt. ¶ 230; *Rose v. Simms*, 95 Civ. 1466, 1995 WL 702307, at *10 (S.D.N.Y. Nov. 29, 1995). UCC has alleged all the elements of a joint venture. According to UCC, the CUA "envisioned a joint relationship of trust and confidence;" the CUA "created a joint Management Committee ... to review the progress of the UCC/Shell Venture;" UCC and SOC "jointly shared the risk of profit and loss in the Venture;" and UCC and SOC committed to developing and sharing "technology and other proprietary information for use in the Venture." Cplt. ¶ 230. Therefore, UCC has alleged facts sufficient to suggest that a fiduciary relationship exists between it and SOC by virtue of the CUA.[7] Accordingly, the motion to dismiss Count II is denied.

**IV.** *Count I: Fraud by SOC and SPC*

**A.** *Summary of Fraud Claim*

In Count I of its Complaint, UCC

---

**5.** Count II also alleges that SPC had a fiduciary relationship with UCC and Seadrift by virtue of "the purported assignment of [SOC's] rights and obligations under the CUA, the Seadrift Partnership Agreement, and related agreements...." Cplt. ¶ 231. UCC alleges that SPC breached this duty by continuing or assisting the actions of SOC that constitute a breach of fiduciary duty. *Id.* ¶ 232. For simplicity, in the discussion of this Count, I will refer only to SOC, although the analysis applies with equal force to the relationship between UCC/Seadrift and SPC.

**6.** This Opinion will refer to briefs in the following manner. Moving briefs are called "[name of defendant group] Mem." Plaintiff's opposition to the moving brief of a particular defendant group is called "UCC Opp.Mem. ([name of defendant group])." Finally, reply briefs are called "[name of defendant group] Reply."

**7.** SOC concedes that "the Seadrift Partnership Agreement may have created a fiduciary relationship," but states that "that fiduciary relationship was limited to the subject matter of that agreement," which was "'to construct, own, and operate the Seadrift plant, which became operational in May 1985.'" SOC/SPC Reply Mem. at 4 (quoting Cplt. ¶ 64). SOC thus implies that because UCC's allegations in Count II do not relate to the operation of the Seadrift plant, any fiduciary duty arising from the Seadrift Partnership Agreement is irrelevant to this Count. It is unnecessary, however, to address the significance of the Seadrift Partnership Agreement to Count II because I find that UCC has properly alleged a breach of a fiduciary duty between UCC and SOC based on the CUA.

alleges a fraudulent scheme by SOC to (1) raise the price of SHAC catalyst well above its actual value under the relevant contracts; (2) inflate the purchase price of SPC far beyond its proper value; and (3) injure the competitive standing of the UNIPOL Total Package License to the financial benefit of Montell.

UCC Opp.Mem. (SOC/SPC) at 8 (citing Cplt. ¶¶ 219–26). According to UCC, SOC secretly misappropriated jointly owned technology and used that technology to develop a much cheaper method of producing catalyst (known as the MSR system). Cplt. ¶¶ 215–17. UCC alleges that SOC never told it that SOC had developed the cheaper production system. Further, UCC maintains that SOC charged UCC and UNIPOL licensees higher prices for that SHAC catalyst rather than pass along the savings in production costs created by the MSR system. *Id.* ¶ 219. UCC also alleges that SOC engaged in fraudulent accounting techniques in order to conceal from UCC its development of the new catalyst production method, in order to create the appearance that catalyst production costs had risen, and in order to maintain the appearance that SOC was not receiving a rate of return on the catalyst business in excess of the contractual limit. *Id.* ¶¶ 139, 216–21, 226.

UCC alleges that SOC made repeated fraudulent misrepresentations, in furtherance of this scheme, to the effect that SOC was complying with contractual restrictions on the rate of return for catalyst production. *Id.* ¶ 220(c). UCC then alleges that it relied on this misrepresentations to its detriment. Specifically, UCC claims that, through Seadrift, it "purchased SHAC catalyst at grossly inflated prices, attempted to convince potential licensees to obtain UNIPOL licenses despite the high cost of SHAC catalyst, and was prevented from seeking to halt SOC's practice of overcharging for catalysts." UCC Opp.Mem. (SOC/SPC) at 9 (citing Cplt. ¶¶ 220, 222). Finally, the claim includes an allegation by UCC that SOC made affirma-

tive misrepresentations regarding the MSR system to an appraiser, resulting in injury to UCC by virtue of the "improper[ ] and unlawful[ ] inflati[on of] the purchase price of SPC by over $50 million." Cplt. ¶ 219. (UCC contends that it had no choice but to pay the inflated appraised value of SPC in order to mitigate further injury. UCC Opp. Mem. (SOC/SPC) at 9.)

### B. *Sufficiency of Fraud Claim*

SOC urges dismissal of Count I on three separate grounds.[8] First, SOC argues that the claim is subsumed by UCC's breach of contract claims; second, SOC contends that UCC has not adequately pled reliance damages; and third, SOC argues that the claim lacks the specificity required by Fed.R.Civ.P. 9(b).

### 1. *Whether fraud claim is subsumed by breach of contract claims*

■ SOC argues that UCC's allegation that SOC concealed its breach of contract from UCC "is insufficient to transform what would normally be a breach of contract action into one for fraud." *Reuben H. Donnelley Corp. v. Mark I Marketing Corp.*, 893 F.Supp. 285, 290 (S.D.N.Y.1995). "Where the fraudulent conduct alleged amounts only to the defendant's false representation that it was adhering to the terms of the contract, the claim for fraud must be dismissed as redundant of the breach of contract claim." *Glynwill Investments, N.V. v. Prudential Sec., Inc.*, 92 Civ. 9267, 1995 WL 362500, at *7 (S.D.N.Y. June 16, 1995) (citation omitted). However, "the same conduct which may constitute a breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself." *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (1st Dep't 1987); *see also MBW Advertising Network, Inc. v. Century Business Credit Corp.*, 173 A.D.2d 306, 569

8. The arguments are made jointly with SPC, which is SOC's wholly-owned subsidiary (*see* Cplt. ¶ 20). SPC is implicated in the fraud claim's allegation that "SPC has also defrauded UCC by falsely representing to UCC that the mixed-solvent recovery system was not Joint De-

velopment Technology of UCC and [SOC] and by assisting [SOC] in misrepresenting to the appraiser the relevant facts relating to the allegedly separate mixed-solvent recovery business." Cplt. ¶ 226.

N.Y.S.2d 682, 682 (1st Dep't 1991) ("the same acts which give rise to a cause of action for fraud may also form the basis for a breach of contract claim," although the fraud claim "will not arise if the alleged fraud merely relates to the breach of contract").

As discussed above, UCC has properly alleged the existence of a fiduciary duty between SOC and UCC arising from the CUA. This duty constitutes "a legal duty which exists 'independent of contractual relations between the parties,'" and thus allows UCC to sue in tort. *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir.1980). "[A]n action for fraud will lie, notwithstanding that the breached fiduciary duty arose from the contract establishing the fiduciary relationship." *GLM Corp. v. Klein*, 665 F.Supp. 283, 286 (S.D.N.Y.1987). Accordingly, UCC's fraud claim will not be dismissed on the ground that it is inseparable from the contract claims.

SOC also argues that in order for the fraud claim to stand, UCC must allege damages in addition to those flowing from the alleged breach of contract. SOC/SPC Mem. at 9. However, the *Glynwill* court stated that "a difference in the measure of damages is a factor to consider in determining whether a fraud claim is independent of a contract claim, . . . , but it is not dispositive of the matter." 1995 WL 362500, at *8 (citation omitted). Further, some courts have assessed the sufficiency of a fraud claim without even discussing whether alleged fraud damages differ from damages alleged under the contract. *See, e.g., GLM Corp.*, 665 F.Supp. at 286; *Licette Music Corp. v. A.A. Records, Inc.*, 196 A.D.2d 467, 601 N.Y.S.2d 297, 297–98 (1st Dep't), *leave to appeal denied*, 82 N.Y.2d 662, 610 N.Y.S.2d 149, 632 N.E.2d 459 (1993). As UCC suggests, a "claim of distinct fraud damages is merely one *means* by which a plaintiff can demonstrate that its fraud claim alleges 'extraneous' facts or duties sufficient to distinguish it from a simple breach of contract." UCC Opp.Mem. (SOC/SPC) at 12 (citing *Americana Petroleum Corp. v. Northville Indus. Corp.*, 200 A.D.2d 646, 606 N.Y.S.2d 906, 908 (2d Dep't 1994) (emphasis in original)). In any event, UCC has properly alleged that it

suffered damages distinctly attributable to SOC's fraud. *See* Cplt. ¶ 219.

### 2. Whether UCC has sufficiently alleged reliance damages

In further support of its contention that UCC's fraud claim is deficient and should be dismissed, SOC argues that UCC has not alleged reliance damages. SOC correctly notes that the "elements of fraud are a material misstatement, known by the perpetrator to be false, made with an intent to deceive, upon which the plaintiff reasonably relies and *as a result* of which he sustains damages." *Megaris Furs, Inc. v. Gimbel Bros., Inc.*, 172 A.D.2d 209, 568 N.Y.S.2d 581, 584–85 (1st Dep't 1991) (emphasis in original). However, UCC has adequately alleged that it suffered damages as a result of relying on SOC's allegedly fraudulent misrepresentations regarding the price of the SHAC catalyst. Assuming the truth of UCC's allegations, and drawing all reasonable inferences from those allegations in UCC's favor, it is evident that UCC asserts that it was injured in several ways.

As the successor in interest to Seadrift, UCC paid catalyst prices that were improperly inflated despite the fact that catalyst manufacturing costs have declined. *See* Cplt. ¶ 219. In addition, UCC was injured because the "attractiveness of a UNIPOL/SHAC Total Package License to prospective licensees" was reduced after the licensees' catalyst costs were improperly increased. *Id.* UCC also alleges harm based on the appraised value of SPC, which was more than $50 million higher than it would have been if SOC's and SPC's fraudulent misrepresentations had not caused the appraiser to treat the MSR process as a separate business rather than as part of the catalyst business. The appraised value determined the price that UCC paid for SPC. *Id.; see also* Cplt. ¶¶ 226, 318, 320. Assuming UCC can prove its allegations, it would be entitled to recover its "out-of-pocket losses and consequential damages." *Delcor Lab., Inc. v. Cosmair, Inc.*, 169 A.D.2d 639, 564 N.Y.S.2d 771, 772 (1st Dep't), *appeal dismissed*, 78 N.Y.2d 952, 573 N.Y.S.2d 646,

578 N.E.2d 444 (1991). UCC has alleged just such damages. Accordingly, SOC's argument that UCC has failed adequately to plead reliance damages is without merit.

### 3. Whether UCC has pled the claim with sufficient particularity

■■■■■ Finally, SOC contends that UCC's fraud claim does not comply with Fed.R.Civ.P. 9(b), which requires that "the circumstances constituting fraud ... shall be stated with particularity." However, the rule "must be read together with [R]ule 8(a)[,] which requires only a 'short and plain statement' of the claims for relief." *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir.1990) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987); *Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 n. 20 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980)). Consequently, "a general averment, one which provides the defendant with a reasonable opportunity to frame a response, will satisfy Rule 9(b)." *Glickman v. Alexander & Alexander Servs., Inc.*, 93 Civ. 7594, 1996 WL 88570, at *4 (S.D.N.Y. Feb. 29, 1996).

SOC identifies three of UCC's allegations of affirmative misrepresentations in particular that it contends fail to satisfy Rule 9(b). First, SOC attacks the claim that in "billing Seadrift for SHAC catalysts purchased in 1993 and 1994," Shell Oil "falsely represented that its catalysts were not priced at a level that allowed [SOC] to realize a rate of return in excess of its actual cost and a 12% per annum return on capital." Cplt. ¶ 220(c). SOC argues that this "general statement does not specify the statements in the bills that were allegedly fraudulent, the dates of the allegedly fraudulent bills or why the statements were allegedly fraudulent." SOC/SPC Mem. at 12. SOC's argument borders on frivolous. The above-quoted language from the Complaint states exactly why UCC believes the statements were fraudulent. As for specifying which statements in the bills were fraudulent and the date of the bills, UCC has already identified for SOC the precise documents to which it is referring: the bills covering Seadrift's purchase of SHAC catalysts in 1993 and 1994. Further, UCC has stated the time period during which these bills were sent by SOC and has identified the date and amount of a fraudulent price increase (*see* Cplt. ¶ 145). It is unnecessary to require UCC to specify the precise date on which SOC sent each of the fraudulent bills. Because UCC has given SOC enough information to enable it to frame a response, this pleading satisfies the requirements of Rule 9(b).

Second, SOC challenges the allegation that its "announc[ement of] SHAC catalyst price increases in early 1995" contained false representations. *See* Cplt. ¶ 220(c). According to SOC, "[t]his general statement does not specify what was fraudulent about the announcement [or] who was defrauded." SOC/SPC Mem. at 12. Again, SOC is wrong. Paragraphs 220(c) and 226 of the Complaint, for example, clearly state that UCC was defrauded by SOC's misrepresentations, and Paragraph 227 alleges that UCC and Seadrift have suffered injury as a result. And as noted above, the allegations in the Complaint clearly identify the content of SOC's false statement. *See* Cplt. ¶¶ 145, 220(c).

Third, SOC attacks the allegation that

> in statements made by William Chalmers and other [SOC] personnel to Stephen Kaufman and other UCC personnel in response to specific inquiries in 1993 and 1994, including an inquiry at a Venture Management Team Meeting in the fall of 1994, [SOC] falsely represented that its catalysts were not priced at a level that allowed [SOC] to realize a rate of return in excess of its actual cost and a 12% per annum return on capital.

Cplt. ¶ 220(c). It is unclear to the Court how SOC's Rule 9(b) challenge to this claim meets the straight face test. Contrary to SOC's assertions, the allegation at issue specifies what was said to UCC and, together with other allegations of the Complaint, provides the basis for concluding that the statement was false.

To the extent that SOC is challenging the other elements of UCC's fraud claim under Rule 9(b), SOC's argument is rejected. As UCC maintains, the "Complaint adequately describes the misrepresentations at issue and explains that they were made for the purpose of concealing from UCC the excessive profit-

ability of the catalyst business." UCC Opp. Mem. (SOC/SPC) at 18; *see also* summary of fraud claim in Part IV.A., *supra.* Because the Complaint provides SOC with sufficient notice of its alleged misrepresentations to enable it to present a defense (and because, as discussed above, UCC has adequately pled reliance damages and the claim is not subsumed by the breach of contract claims), the motion to dismiss Count I is denied.

## V. Count XIII: Breach by SOC of the Implied Duty of Good Faith and Fair Dealing With Respect to the CUA and Catalyst Sales Contract

SOC asks the Court to dismiss Count XIII on several grounds, at least one of which is persuasive. SOC contends that UCC's claim for breach of the covenant of good faith and fair dealing is duplicative of its claims for breach of contract. Despite UCC's argument to the contrary, and notwithstanding its careful pleading of the claim,[9] the conduct alleged in Count XIII to constitute a breach of the covenant (Cplt. ¶¶ 296–97) is the same as that which forms the basis of UCC's breach of contract claims (*see, e.g.,* Cplt. ¶¶ 271, 285). "Under New York law, parties to an express contract are bound by an implied duty of good faith;" however, "breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992); *see also Apfel v. Prudential–Bache Sec., Inc.,* 183 A.D.2d 439, 583 N.Y.S.2d 386, 387 (1st Dep't 1992), *modified on other grounds and aff'd,* 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (1993). Because it is redundant of UCC's breach of contract claims, Count XIII is dismissed.[10]

## VI. Count VII: Tortious Interference with an Existing Contractual Relationship

In its claim for tortious interference with an existing contractual relationship, UCC implicates all defendants except SOC, SPC, Montell N.V., Montell Polyolefins and Technipol. The remaining defendants are charged with inducing SOC to breach its contract with UCC for the production of polypropylene resin and the licensing of polypropylene technology. Cplt. ¶¶ 259–263. Each defendant charged in this Count has moved to dismiss the claim. *See* Montedison/Technipol Mem. at 15; Shell/Montell Mem. at 18. In New York, in order to state a claim for tortious interference with contract, a plaintiff must allege four elements: (1) the existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach the contract or otherwise render performance impossible; and (4) damages to plaintiff. *Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993) (citing *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956)); *Enercomp, Inc. v. McCorhill Publishing, Inc.,* 873 F.2d 536 (2d Cir. 1989). Defendants contend that UCC has not properly alleged the second and third elements.

## A. Does the Complaint Allege that Defendants' Interference was Knowing and Intentional?

Montedison argues that UCC must allege that Montedison acted for the primary purpose of inducing a breach, or with the knowledge that its actions were certain or substantially certain to induce a breach of contract. Montedison/Technipol Mem. at 17 (citing Restatement (Second) of Torts, § 766 cmt. j (1979)). In addition, Montedison argues that there is no allegation that it knew the details of SOC's contractual relationship with UCC. *Id.* at 19. However, UCC is not required to allege that Montedison had full knowledge of the details of the UCC/Shell Venture. *Gold Medal Farms, Inc. v. Rutland County Co-operative Creamery, Inc.,* 9 A.D.2d 473, 10 A.D.2d 584, 195 N.Y.S.2d 179, 185 (3d Dep't 1959). Moreover, Montedison's arguments ignore the many factual allega-

---

9. UCC alleges breach of the implied duty "to the extent such conduct does not breach express provisions of the CUA" or the Catalyst Sales Contract. Cplt. ¶¶ 296–97.

10. SOC raises two other grounds for dismissing this Count. Because I am granting the motion to dismiss Count XIII, there is no reason to address SOC's additional contentions.

tions in the Complaint. Paragraphs 95–109 of the Complaint sufficiently describe Montedison's efforts to effect "a 'programmed divorce' between UCC and Shell, [thereby] weakening the image and credibility of UCC—Montedison's most 'aggressive and dreadful' Total Package License competitor...." Cplt. ¶ 109. These allegations, incorporated by reference into Count VII (*see* Cplt. ¶ 259), provide ample support for the inference that Montedison either knew that its actions were certain or substantially certain to induce a breach by SOC of its contracts with UCC, or acted with the primary purpose of inducing a breach. Further, these allegations and others belie Montedison's claim that UCC relies on a "bare legal conclusion." *See* Cplt. ¶¶ 142–44, 161–95.

### B. *Does the Complaint Allege that SOC Breached a Contract?*

The Shell/Montell defendants also contend that UCC's pleading is deficient, primarily because Count VII contains an allegation that the defendants "rendered [SOC's] performance of its contractual obligations more difficult." Cplt. ¶ 261; Shell/Montell Mem. at 18–19. These defendants argue that a plaintiff suing for tortious interference with contract must allege "defendant's intentional inducement of the third party to breach the contract or otherwise render performance impossible." Shell/Montell Mem. at 18–19 (citing *Museum Boutique Intercontinental, Ltd. v. Picasso,* 886 F.Supp. 1155, 1161 (S.D.N.Y.1995)). However, as *Museum Boutique* makes clear, while a number of New York courts (as well as federal courts in New York interpreting New York law) have held that a plaintiff must allege actual breach, "other courts have held that a plaintiff does not have to allege a breach of the underlying contract in order to state a claim for tortious interference with contractual relations."

*Museum Boutique,* 886 F.Supp. at 1161–62 (collecting cases). In any event, as UCC suggests, the distinction is irrelevant to the disposition of this motion. UCC pleads, in relevant part, that "[t]he defendants ... intentionally and wrongfully induced SOC to breach its contractual obligations to UCC ... *and/or* rendered [SOC's] performance of its contractual obligations more difficult...." Cplt. ¶ 261 (emphasis added). Because the first half of UCC's alternative pleading meets the "actual breach" standard, I need not decide whether an allegation that performance under a contract has been made more difficult still suffices to state a claim for tortious interference with contract in New York.[11]

### C. *Must UCC Allege Specific Actions by Defendants That Were a "But For" Cause of the Breach?*

Montedison further argues that UCC has alleged no specific acts of Montedison without which SOC would not have breached its contracts with UCC. Montedison contends that UCC's claim that it "intentionally and wrongfully induced [SOC] to breach its contractual obligations to UCC" (Cplt. ¶ 261) is "devoid of any allegation of conduct by Montedison resulting in such inducement or any allegation as to how Montedison induced SOC to breach its contractual obligations to UCC." Montedison/Technipol Mem. at 20. Montedison is incorrect. UCC's Complaint alleges plenty of specific conduct by Montedison. *See, e.g.,* Cplt. ¶ 106 ("Montedison ... contacted RDS and [SOC] and proposed combining their respective polyolefins businesses into a worldwide venture that would necessarily weaken competition from UCC ...."); ¶ 107 ("Beginning in July 1991, representatives of RDS, [SOC], and Montedison met ... to discuss and negotiate a possible venture ...."); ¶ 109 ("a senior

**11.** Thus I specifically decline to address the import in this case of the recent ruling of the New York Court of Appeals, which held that an actual breach of contract is required (or at least a showing that performance is rendered impossible) in order to state a claim of interference with existing contractual relations. *See NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.,* 87 N.Y.2d 614, 620–21, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996).

Further, despite the request of Shell/Montell, I decline to require UCC to replead this count in order to specify "what allegations relate to actual breaches of contract that it claims were caused by interference from the defendants." Shell/Montell Reply at 10. Instead, I refer the Shell/Montell defendants to Paragraphs 131–55 and 271 of the Complaint.

Montedison executive ... informed the lead Montedison negotiator ... involved in the proposed Sophia joint venture discussions that the combination of RDS, [SOC], and Montedison would lead to a 'programmed divorce' between UCC and [SOC], weakening the image and credibility of UCC ...").

■ In addition, Montedison contends that UCC's claim is deficient because it does not allege that " 'there would not have been a breach but for the activities of defendants.' " Montedison/Technipol Mem. at 20 n. 11 (quoting *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 828 (2d Cir.1990), *cert. denied*, 499 U.S. 907, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991)). While *Sharma* does contain the quoted language, a complete reading of the case suggests that the tortious interference claim was dismissed not because of plaintiff's failure to include particular language in its allegation, but rather because plaintiff's stated theory of the case (that the breach of contract was motivated by profit) was "incompatible with an allegation of 'but for' cause as to" the defendant. *Sharma*, 916 F.2d at 828. No such incompatibility exists in the instant case. Furthermore, several recent decisions from New York state courts addressing tortious interference with existing contractual relations make no mention of any requirement that explicit "but for" language is necessary to withstand a motion to dismiss. *See, e.g., Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 425, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996); *Washington Ave. Assocs., Inc. v. Euclid Equip., Inc.*, —— A.D.2d ——, ——, 645 N.Y.S.2d 511 (2d Dep't 1996); *M.J. & K. Co. v. Matthew Bender and Co.*, 220 A.D.2d 488, 631 N.Y.S.2d 938, 940 (2d Dep't 1995).

A recent case from a district court in this circuit is similar and instructive. In *Lane's Floor Coverings, Inc. v. Ardex, Inc.*, No. CV–

95–4078, 1996 WL 19182 (E.D.N.Y. Jan. 4, 1996), the defendant moved to dismiss plaintiff's claim for tortious interference with contract "because plaintiff neglected to allege that, 'but for' the actions of the defendant, the third party would have performed under its agreement with plaintiff." 1996 WL 19182 at *3. Noting that "a Rule 12(b)(6) motion requires assuming facts in a light most favorable to the claimant," the court held that

> Plaintiff properly alleges ... that at some point following [the formation of the] agreement, the defendant knowingly interfered with that relationship and improperly induced [the third party] to breach its agreement with plaintiff. In substance, if not literally, plaintiff's complaint charges that, but for the actions of [defendant], [the third party] would not have breached its contract with plaintiff. Further, the language of the [claim] comports with the most recent pronouncement on the subject by the New York Court of Appeals.

*Id.* (citing *Kronos*, 81 N.Y.2d at 94, 595 N.Y.S.2d 931, 612 N.E.2d 289). That analysis applies with equal force to the instant case. Taken together, and drawing all reasonable inferences in UCC's favor, the allegations of the Complaint clearly charge that SOC would not have breached its contractual obligations to UCC but for specific acts of interference by the defendants. *See* Cplt. ¶¶ 84–109, 117, 161–212, 234–58. For that reason, and for the reasons described in Parts VI.A. and VI.B., *supra*, the motion to dismiss Count VII is denied.[12]

## VII. *Count VIII: Tortious Interference with Prospective Contractual Relationships*

In its claim for tortious interference with prospective contractual relationships, UCC

---

**12.** The Shell/Montell defendants also argue that UCC's purchase of the assets of SPC at 85% of fair market value (as determined by an independent appraiser) has eliminated any damage claimed by UCC as a result of SOC's assignment of and withdrawal from the CUA. Shell/Montell Mem. at 19; *see also* Cplt. ¶ 271(g) (alleging breach by SOC through its purported assignment of the CUA). Shell/Montell suggests that UCC's allegation that it bought the assets of SPC "in part to mitigate UCC's damages" limits the

amount of damages to which UCC is entitled for Count VII. *See* Cplt. ¶ 156. At this point, I note only that UCC has properly alleged the damage element of its claim for tortious interference with existing contractual relations. *Id.* ¶ 263. While these damages may be limited by UCC's purchase of SPC's assets, they are not eliminated. It is premature at this stage of the litigation to attempt to assess damages for a claim that UCC has yet to prove, and I decline to do so.

implicates all defendants except SPC, Montell N.V., Montell Polyolefins and Technipol. The remaining defendants are charged with taking actions with the purpose and effect of preventing

> (1) potential licensees of the UNIPOL/SHAC technology from contracting with the UCC/Shell Venture; (2) UCC and [SOC] from expanding the UCC/Shell Venture through Project Nautilus or otherwise; (3) RDS from utilizing UNIPOL technology in new RDS polypropylene facilities; and (4) Shell Canada from utilizing UNIPOL technology in new Shell Canada polypropylene facilities.

Cplt. ¶ 265. Each defendant charged in this Count urges dismissal of the claim on several grounds.

### A. *Statute of Limitations*

Defendants argue that the statute of limitations bars most of UCC's claim for tortious interference with prospective contractual relations. All parties agree that the statute of limitations applicable to this claim is three years. *See* N.Y.Civ.Prac.L. & R. 214(4) (McKinney 1990); UCC Opp.Mem. (Montedison/Technipol) at 11; Shell/Montell Mem. at 15; Montedison/Technipol Mem. at 6. Defendants' arguments are aimed specifically at parts (2), (3) and (4)· of UCC's claim; that is, the parts of the claim relating to the proposed expansion of the UCC/Shell Venture through Nautilus and the potential usage of UNIPOL technology in new RDS and Shell Canada polypropylene facilities.

### 1. *Expansion through Nautilus*

■ Defendants maintain that UCC's claim regarding the decision not to expand the UCC/Shell Venture through Nautilus accrued at the latest in December 1991, when SOC "notified UCC that it was terminating the Project Nautilus discussions." Cplt. ¶ 110. But according to UCC, SOC (along with subsidiaries of RDS and Montedison) entered into a letter of intent and a secrecy agreement in December 1991, and thus did not tell UCC at that time that Montedison's and RDS' interference with Nautilus was the reason for terminating the discussions. *Id.* UCC therefore contends that its claim did not accrue until August 1992, when SOC

"obliquely informed UCC that SOC had been lured away from Project Nautilus by overtures made by Montedison and RDS to combine their (and certain SOC) [polypropylene] assets in Project Sophia." UCC Opp.Mem. (Montedison/Technipol) at 12 (citing Cplt. ¶ 119).

■ UCC correctly points out that "the limitation period is tolled during a defendant's fraudulent concealment of facts that would alert the plaintiff to the plaintiff's claim." *Johnson v. Nyack Hosp.*, 891 F.Supp. 155, 164 (S.D.N.Y.1995), *aff'd*, 86 F.3d 8 (2d Cir.1996). Assuming the truth of UCC's allegations, Defendants concealed from UCC, until August 1992, the facts that would alert UCC that it had a claim for tortious interference with prospective contractual relations. However, this doctrine of equitable tolling is "subsumed within [CPLR] 203(g)." *Glynwill*, 1995 WL 362500, at *4. That statute provides, in relevant part, that

> where the time within which an action must be commenced is computed from the time when facts were discovered or from the time when facts could with reasonable diligence have been discovered, or from either of such times, the action must be commenced within *two years* after such actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer.

N.Y.Civ.Prac.L. & R. 203(g) (McKinney Supp.1996) (emphasis added). Therefore, "applicability of [the equitable tolling] doctrine cannot extend the limitations period beyond the two years prescribed by the statute." *Glynwill*, 1995 WL 362500, at *4; *see also Cestaro v. Mackell*, 429 F.Supp. 465, 468–69 (E.D.N.Y.), *aff'd*, 573 F.2d 1288 (2d Cir.1977). UCC did not file its original complaint in this action until January 9, 1995. Therefore, whether the limitations period is calculated as three years from December 1991 or as two years from August 1992, UCC's claim as it relates to the expansion of the UCC/Shell Venture through Nautilus is time barred. Consequently, that portion of the claim is dismissed.

### 2. Prospective contract with Shell Canada

■ According to UCC, its claim with respect to Shell Canada (that Defendants' tortious interference resulted in Shell Canada's decision not to use UNIPOL technology in new polypropylene facilities in Canada) did not accrue until after July 30, 1992. On that date, SOC, RDS and Montedison entered into a Memorandum of Understanding which contemplated, among other things, that "Shell Canada would contribute its Sarnia polypropylene plant" to the " 'partial merger' of their worldwide polyolefins business[es] into the Sophia Venture." Cplt. ¶ 118. Defendants argue that even if July 1992 is the date of accrual (which they dispute), the claim is time barred because UCC did not raise the claim until filing its Third Amended Complaint on January 18, 1996. Further, Defendants argue, the claim does not relate back to UCC's original complaint (filed on January 9, 1995) under Fed.R.Civ.P. 15(c).[13]

■ Rule 15(c)(2) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when ... (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." This rule is "to be liberally construed" (*Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir.1983) (per curiam)), and the "principal inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party 'by the general fact situation alleged in the original pleading.'" *In re Chaus Sec. Litig.*, 801 F.Supp. 1257, 1264 (S.D.N.Y.1992) (quoting *Contemporary Mission, Inc. v. New York Times Co.*, 665 F.Supp. 248, 255 (S.D.N.Y. 1987), *aff'd*, 842 F.2d 612 (2d Cir.), *cert. denied sub nom. O'Reilly v. New York Times Co.*, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988)).

■ UCC's tortious interference claim regarding the decision of Shell Canada not to use the UNIPOL/SHAC technology at its Sarnia polypropylene facility relates back to UCC's Original Complaint of January 9, 1995. The original complaint in this action contained a claim for tortious interference with prospective contractual relationships, albeit a claim that did not specifically allege interference with a prospective contract between UCC and Shell Canada. *See* Orig. Cplt. ¶¶ 178–84. However, "[t]here is no requirement that the new claim must have been asserted in the original pleading. A single transaction or occurrence can give rise to numerous claims." *Koal Indus. Corp. v. Asland, S.A.*, 808 F.Supp. 1143, 1158 (S.D.N.Y.1992). Such is the case here. In its original complaint, UCC alleged that "[b]y agreeing to support and/or participate in the Shell/Himont Joint Venture, the defendants have intentionally and improperly, without legal excuse or justification, interfered with UCC's prospective contractual relationships involving licensing of the UNIPOL/SHAC technology." Orig. Cplt. ¶ 179. This allegation, along with the portions of the complaint describing the Shell/Himont Joint Venture (*see generally* Orig. Cplt. ¶¶ 48–95), set forth the general fact situation sufficiently to provide Defendants "adequate notice of the matters raised in the amended pleading." *See Chaus Sec. Litig.*, 801 F.Supp. at 1264.

### 3. Prospective contract with RDS

■ The analysis of whether the portion of the tortious interference claim regarding RDS' decision not to use UNIPOL technology in new polypropylene facilities is time barred is similar to the above analysis regarding Shell Canada. As with Shell Canada, I find that the claim for tortious interference with a prospective contract with RDS relates back to UCC's Original Complaint. However, the Complaint is unclear as to when UCC alleges it incurred the RDS injury—that is, when RDS told UCC it had decided not to use UNIPOL technology in its new polypropylene facilities.

---

**13.** Defendants contend that the claim accrued in January 1992, when Shell Canada "informed UCC ... that it was deferring a UNIPOL licensing decision, and committed to participation in the Sophia discussions." Cplt. ¶ 113. However, I need not decide this issue, because the relation-back issue is dispositive. If the claim, raised in January 1996, does not relate back to the Original Complaint, it must have accrued no earlier than January 1993. Thus it would be time barred whether January or July 1992 is used as the date of accrual.

According to UCC, RDS had contemplated the use of UNIPOL technology for some time. A 1987 Strategy Update for RDS stated that the preferred process for new RDS plants was UNIPOL. Cplt. ¶ 80. In November 26, 1990, it was recommended to the RDS Coordinators Meeting that RDS commission a new UNIPOL plant in Berre, France at the end of 1994. *Id.* ¶ 81. Further, in July 1991, a report to RDS management observed that a gas phase process such as UNIPOL might be selected over RDS' proprietary earlier generation process for the future production of homopolymer. *Id.* ¶ 82.

At some point, this tide in favor of UNIPOL turned. In December 1991, SOC and subsidiaries of RDS and Montedison entered into a letter of intent and a secrecy agreement in connection with Project Sophia. Cplt. ¶ 110. UCC also asserts that the existence of these agreements was not disclosed to UCC, but that RDS did not engage in further discussions with UCC regarding UNIPOL licensing after the agreements were signed.[14] *Id.* Although UCC alleges that Shell Canada told UCC in January 1992 that it was "deferring a UNIPOL licensing decision" (*id.* ¶ 113), UCC makes no corresponding allegation regarding RDS. On July 30, 1992, SOC, Montedison and RDS entered into a Memorandum of Understanding addressing the " 'partial merger' of their worldwide polyolefins business[es] into the Sophia venture" but did not disclose this fact to UCC. *Id.* ¶ 118. Disclosure came a few days later. On August 5, 1992, SOC told UCC that RDS and Montedison were discussing proposals for a joint venture. *Id.* ¶ 119. On September 17, 1992, "RDS and Montedison announced that they had signed a Memorandum of Understanding to evaluate worldwide integration of their polyolefins businesses, and associated feedstock and technology activities, into a new jointly owned enterprise." *Id.* ¶ 124.

Given this sequence of events, I conclude that UCC's claim accrued in August 1992,

when UCC learned through SOC that RDS and Montedison were discussing a possible joint venture. That appears to be the earliest that UCC was put on notice that RDS would most likely not enter into new contracts with it to license UNIPOL technology. Using August 1992 as the date of accrual, UCC would have to file a claim for tortious interference with prospective contractual relations with RDS by August 1995. Since I have already held that UCC's claim in its Third Amended Complaint relates back to the original complaint of January 1995, UCC's claim regarding prospective RDS contracts is not time barred.

**B. *Does the Complaint Allege Prospective Contractual Relationships?***

**1. *Standard***

 Defendants next argue that UCC's claim should be dismissed because it does not sufficiently allege any prospective contractual relationships with which Defendants interfered. In New York, this tort is recognized " 'where a party *would* have received a contract but for' " a defendant's interference. *Gertler v. Goodgold,* 107 A.D.2d 481, 487 N.Y.S.2d 565, 572 (1st Dep't), *aff'd,* 66 N.Y.2d 946, 498 N.Y.S.2d 779, 489 N.E.2d 748 (1985) (quoting *Union Car Advertising Co. v. Collier,* 263 N.Y. 386, 401, 189 N.E. 463 (1934)) (emphasis in original); *see also Robbins v. Ogden Corp.,* 490 F.Supp. 801, 811 (S.D.N.Y.1980). Although the "would have received the contract" test is a strict one (*see Optivision, Inc. v. Syracuse Shopping Ctr., Assocs.,* 472 F.Supp. 665, 685 (N.D.N.Y.1979)), the tort extends to "mere negotiations." *Morse v. Swank, Inc.,* 459 F.Supp. 660, 667 (S.D.N.Y.1978) (citing *Union Car Advertising,* 263 N.Y. at 401, 189 N.E. 463). It is not necessary to show that negotiations for the prospective contract had reached the conclusive stage. *See Williams & Co. v. Collins, Tuttle and Co.,* 6 A.D.2d 302, 176 N.Y.S.2d 99, 104 (1st Dep't 1958),

---

14. The Shell/Montell defendants contend that "[a]ccording to UCC, ... the Shell defendants ceased all 'further UNIPOL licensing discussions with UCC' in December 1991." Shell/Montell Mem. at 16. This phrasing is somewhat disingenuous, in that it implies that RDS *told* UCC in

December 1991 that it [RDS] was ceasing licensing discussions. UCC actually alleges that "RDS and Shell Canada also did not pursue any further UNIPOL licensing discussions with UCC after the Letter of Intent was signed in December 1991." Cplt. ¶ 110.

*appeal denied,* 5 N.Y.2d 709, 182 N.Y.S.2d 1025, 156 N.E.2d 463 (1959).

However, case law is in conflict regarding the precise nature of the test. Some courts have held that a plaintiff's allegations must reflect a greater likelihood than "being reasonably certain" or "having a reasonable expectation" of receiving a contract. *See C.E.D. Mobilephone Communications, Inc. v. Harris Corp.,* 81 Civ. 4651, 1985 WL 193, at *8 (S.D.N.Y. Jan. 14, 1985); *Optivision,* 472 F.Supp. at 685; *Williams,* 176 N.Y.S.2d at 104. By contrast, other courts have stated that claims of tortious interference with business relations may be sustained where "the plaintiff had a 'reasonable expectancy' of a contract with the third party." *Strapex Corp. v. Metaverpa N.V.,* 607 F.Supp. 1047, 1050 (S.D.N.Y.1985); *see also Davidcraft Corp. v. Danu Int'l, Inc.,* 90 Civ. 6578, 1992 WL 162997, at *4 (S.D.N.Y. June 24, 1992) (while "[e]arlier cases hold that the plaintiff must prove that it 'would have received the contract' but for the interference . . . [s]ome later cases, however, appear to have adopted the less stringent 'reasonable certainty,' or 'reasonable expectation' test") (internal citations omitted); *All Boys Music, Ltd. v. De-Groot,* 89 Civ. 8258, 1992 WL 51502, at *9 (S.D.N.Y. Mar. 9, 1992); *Morse,* 459 F.Supp. at 667 (tortious interference claims viable where plaintiff has "a reasonable expectancy of a contract"). In any event, it is clear that the requirements for establishing liability for interference with prospective contractual relations are "more demanding" than those for interference with performance of an existing contract. *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980).

### 2. *Shell Canada*

██ Recognizing the strictness of this standard, I cannot say that UCC has met the requirements for pleading tortious interference with prospective contractual relations with Shell Canada. UCC alleges only that Shell Canada "concluded that . . . a new low cost UNIPOL plant would provide Shell Canada with a competitive facility" (Cplt. ¶ 91); that Shell Canada conducted a study of the feasibility of constructing a new polypropylene plant at its Sarnia site using UNIPOL technology (*id.*); that Shell Canada "was exploring taking a UNIPOL license . . . for a new 120,000 ton polypropylene plant in Sarnia, Ontario scheduled to become operational in 1995. . . ." (*id.* ¶ 113); and that Shell Canada "remained interested in taking a UNIPOL license for a new polypropylene plant . . . into late 1991" (*id.*). These allegations do not form a sufficient basis for concluding that but for Defendants' interference, Shell Canada was reasonably certain (let alone more than reasonably certain) to have entered into a UNIPOL licensing agreement for its Sarnia plant.

### 3. *RDS*

██ By contrast, I find that UCC's allegations regarding its prospective contractual relations with RDS suffice to state a claim. As detailed in Part VII.A.3., *supra,* UCC alleges that in 1987, an RDS Strategy Update stated that UNIPOL was the preferred process for new RDS plants. Cplt. ¶ 80. In 1990, RDS received a recommendation that it commission a new UNIPOL plant in Berre, France at the end of 1994. *Id.* ¶ 81. A July 1991 report stated that a gas phase process such as UNIPOL might be selected over RDS' proprietary earlier generation process for the future production of homopolymer. *Id.* ¶ 82. Finally, an August 1991 RDS Polypropylene Technology Review stated that "the choice of UNIPOL gas phase technology . . . was made several years ago and was supported by an update comparison with other gas phase technologies, which demonstrated that RDS had 'no need' for other process technologies." Cplt. ¶ 115. That Review also "recommended strengthening cooperation with UCC in the context of the UNIPOL license." *Id.*

These specific allegations allow the Court to infer that RDS was reasonably certain to have entered into UNIPOL licensing agreements with UCC for future polypropylene plants. I adopt the reasoning of those cases applying a "reasonable certainty" test, and I find that UCC has met that test with respect to the prospective licensing agreement with RDS. *See Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 554 F.Supp. 838, 850 (S.D.N.Y.1982), *aff'd,* 724 F.2d 290 (2d Cir.

1983), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984) ("[w]hile ... 'mere anticipation' of a contract is not sufficient to make out a proper claim for interference with prospective business relations, [citing *Optivision* ], we cannot say at this early point in the proceedings that plaintiff could not prove facts alleged in its complaint that would show a high degree of likelihood that such contracts would have been entered into but for defendants' arguably unlawful actions"); *Smith v. Emlan Realty Corp.,* 392 N.Y.S.2d 668, 669, 392 N.Y.S.2d 668 (2d Dep't 1977) ("plaintiff must show more than a qualified probability" of completing the contract, but need not "plead, in exact detail, the circumstances which, on a trial, would prove that success would have been inevitable but for the tortious acts of defendants").

### 4. *Third-party licensees*

■■■ The final component of UCC's tortious interference claim—that Defendants' interference prevented potential licensees of the UNIPOL/SHAC technology from contracting with the UCC/Shell Venture—suffers from two defects. First, the claim is deficient because UCC does not identify any particular potential licensee or set of negotiations with which it claims Defendants interfered. *See El Greco Leather Prods. Co. v. Shoe World, Inc.,* 623 F.Supp. 1038, 1044 (E.D.N.Y.1985), *aff'd,* 806 F.2d 392 (2d Cir. 1986), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987).[15] The second defect, perhaps resulting from the first, is that UCC has not "allege[d] facts sufficient for the Court to infer" that contractual relationships would have been (or even are reasonably certain to have been) consummated with any potential licensees. *See Riddell Sports Inc. v. Brooks,* 872 F.Supp. 73, 79 (S.D.N.Y.1995). Accordingly, the portion of Count VIII relating to potential third-party licensees of the UNIPOL/SHAC technology is dismissed.

### C. *Does the Complaint Allege an Act of Interference by Montedison?*

Montedison also argues that UCC has failed to allege any specific action by Montedison that interfered with UCC's prospective contractual relationship with RDS.[16] However, UCC's Complaint is replete with such allegations. *See* Cplt. ¶¶ 95–110, 179. The Complaint sufficiently alleges efforts by Montedison to create a joint venture with RDS and SOC while knowing that such a venture would interfere with UCC's prospective relations with RDS.

### D. *Does the Complaint Allege Improper Interference by Montedison?*

■■■ Finally, Montedison contends that even if UCC has alleged that it interfered with UCC's prospective contractual relations, it has not alleged that such interference was improper. Under New York law, a plaintiff must allege the defendant's interference with prospective business relations "either with the sole purpose of harming the plaintiff or by means that are 'dishonest, unfair or in any other way improper.' " *PPX Enters., Inc. v. Audiofidelity Enter.,* 818 F.2d 266, 269 (2d Cir.1987) (quoting *Martin Ice Cream Co. v. Chipwich, Inc.,* 554 F.Supp. 933, 945 (S.D.N.Y.1983)); *see also Della Pietra v. State,* 125 A.D.2d 936, 510 N.Y.S.2d 334, 336 (4th Dep't), *aff'd,* 71 N.Y.2d 792, 530 N.Y.S.2d 510, 526 N.E.2d 1 (1988). "If the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct." *PPX Enters.,* 818 F.2d at 269 (citations omitted).

UCC concedes that because it competes with "Montedison in the licensing of [polypropylene] technology and (through the UCC/Shell Venture) in the manufacture of [polypropylene] resins, ... Montedison's actions vis-a-vis RDS/SOC and the formation of

---

**15.** *Volvo North America Corp. v. Men's Int'l Professional Tennis Council,* 857 F.2d 55, 74 (2d Cir.1988), lends no support to UCC. In that case, the complaint actually named third parties who plaintiff alleged were sent letters by defendant that denigrated the plaintiff.

**16.** Actually, Montedison makes this argument (and the next one) in opposition to UCC's entire claim for tortious interference with prospective contractual relations. Because I have already dismissed all of the claim except as it relates to prospective contractual relations with RDS, I will apply Montedison's arguments only to that remaining portion.

Montell were taken, at least in part, to advance Montedison's own competing interests." UCC Opp.Mem. (Montedison/Technipol) at 20. Therefore UCC must allege that Montedison used criminal or fraudulent means to interfere. UCC has alleged just such conduct in its claims of antitrust violations (Counts III–VI, discussed in Parts X and XI, *infra*). See *Anti–Monopoly, Inc. v. Hasbro, Inc.*, 94 Civ. 2120, 1995 WL 380300, at *7 (S.D.N.Y. June 27, 1995) (denying motion to dismiss tortious interference claim because "almost the entire Complaint [was] devoted to allegations that [defendant] had been violating, and continue[d] to violate, the Sherman Antitrust Act, a federal criminal statute. If [plaintiff] can prove that [defendant] has violated the antitrust acts, such conduct should be sufficiently criminal to constitute the predicate required for the tort of tortious interference.") (citation omitted); *cf. Commodore Business Machs., Inc. v. Montgomery Grant Inc.*, 90 Civ. 7498, 1993 WL 14503, at *3 (S.D.N.Y. Jan. 13, 1993) ("In this case, [counterclaiming plaintiff] has asserted valid antitrust claims which provide the unlawful purpose and unjustifiable cause element of its claim of tortious interference with contract").

I therefore hold that UCC has sufficiently alleged improper interference by Montedison. The motion to dismiss UCC's claim for tortious interference with prospective contractual relations is granted in part and denied in part. The components of the claim relating to the expansion of the UCC/Shell Venture through Project Nautilus and relating to prospective contractual relations with potential third-party licensees and with Shell Canada are dismissed. The component of the claim relating to prospective contractual relations with RDS survives.

VIII. *Count X: Breach of CUA by Shell Defendants Other Than SOC and SPC*

The Shell/Montell defendants move to dismiss Count X on the ground that they are not parties to the CUA between SOC and UCC. Further, they contend that they should not be liable for any breach of the CUA under an alter ego theory. In support of its claim, UCC urges this Court to pierce the corporate veil that protects the Shell/Montell defendants from liability for the actions of their subsidiary, SOC.[17] The parties agree that Delaware law governs this issue because SOC is a Delaware corporation. Shell/Montell Mem. at 12 n. 15; UCC Opp.Mem. (Shell/Montell) at 20.

 In order to state an alter ego claim under Delaware law, a plaintiff must plead that the parent and subsidiary "operated as a single economic entity," and "must demonstrate an overall element of injustice or unfairness." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir.1995) (applying Delaware law). Where "a subsidiary is in fact a mere instrumentality or alter ego of its owner," "a court can pierce the corporate veil." *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 793 (Del.Ch.1992). Plaintiff must show that "the owners exercised complete domination of the corporation in respect to the transaction attacked." *Morris v. New York State Dep't of Taxation and Finance*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993). In this case, UCC alleges that SOC "has been dominated and controlled by its parent, Shell Petroleum [Inc.], and by other RDS Group affiliates ... acting in coordination." Cplt. ¶ 274. UCC pleads that in connection with the allegedly unlawful formation of Montell, these companies "caused or directed [SOC] to breach its contractual commitments to UCC under the CUA or otherwise to take actions harmful to UCC," in addition to using SOC "to achieve their own otherwise unlawful business interests and subordinating the business interests of [SOC] to their own." *Id.*

To be sure, a conclusory allegation of domination or control is not enough to justify

---

17. SOC is a wholly-owned subsidiary of Shell Petroleum Inc., and is a member of the Royal Dutch Shell (RDS) Group. That group also includes Shell Petroleum Inc., Shell Petroleum N.V., The Shell Petroleum Co. Ltd., Shell International Chemical Co. Ltd., Shell International Research Maatschappij B.V., and Shell Canada Limited. The RDS Group is controlled directly or indirectly by Royal Dutch Petroleum (60%) and the Shell Transport and Trading Co. (40%). These two entities also together own a fifty percent interest in Montell. *See* Cplt. ¶¶ 14–24.

piercing the corporate veil. Courts have identified several factors relevant in determining whether a parent and a subsidiary operate as a single economic entity. Those factors include whether the corporation was solvent and adequately capitalized, whether corporate formalities were observed, and whether the corporation functioned in general " 'as a facade for the dominant shareholder.' " *Fletcher*, 68 F.3d at 1458 (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. CIV.A. 1331, 1989 WL 110537, at *5 (Del.Ch. Sept. 19, 1989)). However, Defendants have cited no decision holding that the absence of allegations of specific *Fletcher* factors justifies granting a motion to dismiss where the plaintiff has made other relevant allegations.

In this case, UCC has made numerous other allegations that support its assertion that the Shell/Montell defendants dominated SOC and forced SOC to act contrary to its own interests. For example, UCC alleges that SOC discontinued discussions regarding expansion of the UCC/Shell Venture through Project Nautilus in order to further the interests of RDS. Cplt. ¶¶ 132, 274. In addition, in 1992 SOC reduced its research and development expenditures by approximately thirty percent, and reduced the number of SOC staff assigned to polypropylene research and development by ten percent. *Id.* ¶ 144. In 1994, SOC officials testified before the European Commission that SOC was "neither an advocate nor an adversary of the proposed merger," despite the fact that Montell posed competitive harm to SOC. *Id.* ¶¶ 149, 151, 105–22. SOC also offered to take other steps to the detriment of the UCC/Shell Venture, including terminating its relationship with UCC, in order to allow the Montell transaction to be approved by the EC. *Id.* ¶ 151; *see also id.* ¶¶ 87, 111, 153–55. These assertions constitute sufficient allegations by UCC that the Shell/Montell defendants and SOC operated as a single eco-

nomic entity, and preclude a dismissal of this claim. *See In re Buckhead America Corp.*, 178 B.R. 956, 975 (D.Del.1994) (the nature and extent of the dominion and control exercised by [defendants] over [their subsidiary] is a question of fact, not subject to resolution on a motion to dismiss) (internal quotation omitted); *Geyer*, 621 A.2d at 793 (denying motion to dismiss where "three examples [of alleged domination] provide[d] sufficiently specific factual allegations to support plaintiff's" alter ego claim); *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, Civ.A. No. 8578, 1990 WL 44267, at *5 (Del.Ch. Apr. 12, 1990) (issues of material fact with respect to plaintiffs' veil-piercing theory precluded summary judgment on claim that subsidiary was instrumentality of its parent).

■ Similarly, UCC also sufficiently alleges an overall element of unfairness and injustice. Before entering into the CUA, UCC was assured by SOC executives that SOC "operated independently from RDS." Cplt. ¶ 131. Under the CUA, UCC and SOC agreed to use "their best reasonable efforts" to carry out the "Cooperative Undertaking." *See* Cplt. ¶ 62; CUA Articles 1.12(c)(iii), 2.01, 2.03. UCC shared "confidential and proprietary information and know-how" with SOC in order to further the UCC/Shell Venture, based on these assurances that SOC would act in its own economic interests. *See* Cplt. ¶ 278, 323. It would be unfair to allow the Shell/Montell defendants to use their subsidiary to shield themselves from liability, where they have heretofore ignored that subsidiary's "separate structure and . . . individual economic interests." UCC Opp.Mem. (Shell/Montell) at 22; *see also United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1106 (D.Del.1988), *aff'd*, 879 F.2d 860 (3d Cir. 1989). Therefore, the motion to dismiss the claim for breach of the CUA by the Shell/Montell defendants is denied.[18]

---

**18.** Because I find that UCC has alleged facts sufficient to justify piercing the corporate veil, I need not address UCC's agency theory, which it advanced in its brief.

In addition, Shell/Montell urges dismissal of this Count as against Shell Canada because in Paragraph 274, UCC does not name Shell Canada in its listing of members of the RDS Group.

However, UCC clearly implicates "RDS Group affiliates" in its claim, and does not state that its charge is *limited to* those affiliates it names in that paragraph. UCC specifically alleges that "Shell Canada is a member of the Royal Dutch Shell Group." Cplt. ¶ 22. Accordingly, the claim against Shell Canada stands.

**IX. *Count XVII: Equitable Estoppel Against All RDS Defendants***

UCC alleges that it relied to its detriment on representations by the RDS defendants

> to the effect that [SOC] was and would be operated and managed as a wholly independent and separate company vis-a-vis the rest of the RDS Group, that [SOC's] activities would be conducted in its own best interests, and that [SOC] would contract with one or more other members of the RDS Group only on terms that would be fair to [SOC].

Cplt. ¶ 323. UCC now alleges that these representations were either false or misleading. *Id.* In its claim, UCC seeks to estop SOC from "relying on any contractual language for any other behavior on the part of UCC induced by the RDS Group's avowals of [SOC's] operational independence vis-a-vis the rest of the RDS Group with respect to the subject matter of the UCC/Shell Venture and related matters...." *Id.* ¶ 324. The Shell/Montell defendants have moved to dismiss this claim.

 Despite Defendants' argument to the contrary, estoppel may be pled as an affirmative cause of action.[19] Accordingly, UCC's claim will not be dismissed on the ground that estoppel is only available to bar a defendant from raising a defense. Defendants also invoke the parol evidence rule in support of their motion to dismiss this claim.

"One of the oldest and most settled principles of New York law is that a party may not offer proof of prior oral statements to alter or refute the clear meaning of unambiguous terms of written, integrated contracts to which assent has voluntarily been given." *Azuma N.V. v. Sinks,* 646 F.Supp. 122, 127 (S.D.N.Y.1986) (citations omitted). Defendants have identified no terms of the CUA which they contend conflict with the representations attributed to Defendants by UCC. Therefore, this is not a basis for dismissing UCC's claim for equitable estoppel.[20] If Defendants later seek dismissal of this claim upon a motion for summary judgment, I am confident that they will advise the Court of specific provisions of the CUA with which the oral representations allegedly conflict.

**X. *Count III: Violations of Section 1 of the Sherman Act in the Polypropylene Resin and Impact Co–Polymer Markets by All Defendants Except Montell N.V., Montell Polyolefins, Technipol and SPC***

In Count III, UCC alleges that SOC's "actions in suspending and then terminating the proposed Project Nautilus venture with UCC in 1991" constituted "part of a collusive scheme ... taken in furtherance of Montedison's and RDS' efforts to form an unlawful joint venture" which unreasonably restrains trade and commerce in two specific markets [21] in violation of Section 1 of the Sherman Act.[22] Cplt. ¶ 235. Defendants argue

---

**19.** *See, e.g., K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 827 F.Supp. 985, 989 (S.D.N.Y. 1993) (complaint stated affirmative claim for equitable estoppel); *Lapkin v. Lapkin,* —— A.D.2d ——, 637 N.Y.S.2d 140, 140 (1st Dep't) (granting plaintiff leave to amend complaint "to add a cause of action for equitable estoppel"), *appeal dismissed,* 88 N.Y.2d 843, 644 N.Y.S.2d 689, 667 N.E.2d 339 (1996); *Special Event Entertainment v. Rockefeller Center, Inc.,* 458 F.Supp. 72, 77 (S.D.N.Y.1978) ("a claim based on the doctrine of equitable estoppel has been stated"); *but see Chemical Bank v. City of Jamestown,* 122 A.D.2d 530, 504 N.Y.S.2d 908, 909 (4th Dep't), *appeal denied,* 68 N.Y.2d 608, 508 N.Y.S.2d 1025, 500 N.E.2d 874 (1986) (" '[A]n estoppel does not originate a legal right; it merely forbids the denial of a right claimed otherwise to have arisen' ") (quoting *Morrill Realty Corp. v. Rayon Holding Corp.,* 254 N.Y. 268, 275, 172 N.E. 494 (1930)); 57 N.Y.Jur.2d *Estoppel* § 15 (1986) (same).

**20.** Defendants' remaining contentions—that UCC has not adequately pled the elements of estoppel, and that UCC has failed to assert any specific statements of SOC or the Shell defendants on which UCC relied—are similarly without merit.

**21.** UCC's Complaint contains four antitrust claims (Counts III through VI). Defendants have moved to dismiss two of the claims in full and two claims in part. The Shell/Montell defendants briefed the issues; Montedison joined in their arguments with respect to all four Counts, and Technipol joined in their arguments with respect to Counts IV and V (the only antitrust claims in which Technipol is implicated). *See* Montedison/Technipol Mem. at 2 n. 3 and 3.

**22.** That section of the Sherman Act provides, in part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1 (1973).

that this claim must be dismissed (1) because antitrust law imposes no substantive duty on producers to expand markets, and (2) because UCC suffered no damages, in that it does not assert that Defendants prevented UCC from expanding on its own.

### A. Sufficiency of Claim of Anticompetitive Conduct

 In order to state a claim under Section 1 of the Sherman Act, a plaintiff must allege concerted action by two or more persons which unreasonably restrains interstate or foreign trade or commerce. *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 837 (S.D.N.Y.1988) (citing *Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 78 (2d Cir.1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981)). Plaintiff has met this requirement. In Count III, UCC alleges that

> beginning in 1991, Montedison and RDS conspired with SOC to terminate the planned "project Nautilus" expansion (and a 1994 UCC proposal to build a 200,000 ton UCC/SOC [polypropylene] plant) and to deter Shell Canada from investing in a new UNIPOL plant with the purpose and effect of restricting [polypropylene] resin output, reducing competition, and thereby raising prices, and that this conspiracy unreasonably restrained trade in the [Polypropylene] Resin and Impact Co–Polymer Markets in North America in violation of Section 1 of the Sherman Act.

UCC Opp.Mem. (Shell/Montell) at 6 (citing Cplt. ¶¶ 105–17, 196–212, 234–37). UCC has properly pled facts which, if proven, would entitle it to relief. *See, e.g., Associated Press v. United States,* 326 U.S. 1, 15, 65 S.Ct. 1416, 1422, 89 L.Ed. 2013 (1945); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 129 (2d Cir.1995) (adverse effect on competition as a whole in the relevant market includes reduced output); *Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 257–58 (2d Cir.), *cert. dismissed,* 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989) (acquisition posed clear threat of decreased competition where plain-

tiffs alleged that it would result in higher prices and reduced output).

Defendants maintain that SOC's decision not to proceed with Project Nautilus does not constitute anticompetitive conduct because a firm has no general duty to help its competitors. Shell/Montell Mem. at 3–4. Defendants base this argument, however, on standards applicable to claims of unilateral action under Section 2 of the Sherman Act rather than on standards applicable to concerted action under Section 1. Antitrust law makes a clear distinction between unilateral and concerted conduct. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767–69, 104 S.Ct. 2731, 2739–41, 81 L.Ed.2d 628 (1984); *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555, 1567–68 (11th Cir.1991). Where a concerted refusal to deal with a competitor has injured competition by restricting output, courts have regularly found such conduct illegal. *See, e.g., FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 424–25, 110 S.Ct. 768, 776, 107 L.Ed.2d 851 (1990); *NCAA v. Board of Regents,* 468 U.S. 85, 106–07, 104 S.Ct. 2948, 2963, 82 L.Ed.2d 70 (1984); *United States v. General Motors Corp.,* 384 U.S. 127, 139–41, 86 S.Ct. 1321, 1327–28, 16 L.Ed.2d 415 (1966). Finally, Defendants argue that "declining to invest hundreds of millions of dollars to build new manufacturing facilities ... does not amount to 'restricting output.'" Shell/Montell Mem. at 3. This argument at best raises a question of fact not properly addressed on a motion to dismiss. If, for example, as UCC alleges, Defendants conspired to prevent a new UNIPOL polypropylene resin plan from starting up, such conduct would violate Section 1 of the Sherman Act.[23]

### B. Does UCC Allege That it Was Prevented from Expanding on its Own?

 Defendants also urge dismissal of UCC's claim because they maintain that UCC "fails to allege facts that indicate that it was *prevented* from expanding on its own." Shell/Montell Mem. at 2 (emphasis in original). Defendants are incorrect. UCC has made several factual allegations that Defendants' actions "prevented it from making the

---

**23.** None of Defendants' remaining arguments justifies dismissing Count III on the ground that it does not allege anticompetitive conduct.

capacity expansions contemplated by Project Nautilus." UCC Opp.Mem. (Shell/Montell) at 10. For example, UCC alleges that it "had no practical alternative for constructing a polypropylene plant when [SOC] declined to proceed jointly;" that SOC knew "it would have been impossible for UCC to get an adequate catalyst partner to replace" SOC; and that "Defendants' actions ... prevented new capacity ... from coming on the [North American Polypropylene] market." *See* Cplt. ¶¶ 122, 146, 205, 236. Defendants' disputes with these factual allegations, such as its own factual assertions that UCC "could have expanded on its own" and "was actually in a more advantageous position [to expand] than third-party licensees" (*see* Shell/Montell Mem. at 5 n. 6, 6 n. 8) are irrelevant on a motion to dismiss.[24] UCC has alleged facts that, if proven, would sufficiently establish that Defendants prevented UCC from making capacity expansions on its own or with a third party, and that Defendants caused "substantial and direct injury to overall competition in the relevant markets." UCC Opp. Mem. (Shell/Montell) at 10. *See Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1159 (5th Cir.1992) (reversing lower court's dismissal of antitrust claims because plaintiff did not need "to show how he was damaged at this point" and because allegations "that his business and property were injured ... [were] sufficient to satisfy the requirements of notice pleading"), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993).

XI. *Count VI: Violations of Section 7 of the Clayton Act in the Total Package License and Catalyst Markets by RDS, Shell Transport, Montedison, Shell N.V., Montell N.V., and Montell*

▇▇▇ In Count VI, UCC alleges that the effect of the formation of the Montell venture "may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act (15 U.S.C. § 18)[25] in at least two" specific markets. Defendants challenge UCC's standing to assert this claim. In order to have standing to sue under Section 7 of the Clayton Act, a private plaintiff must allege antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Defendants argue that UCC lacks standing to challenge Montell's formation because "as a competitor in the alleged licensing markets, ... UCC would benefit" from any lessening of competition caused by the Montell transaction and thus "cannot have suffered" antitrust injury. Shell/Montell Mem. at 8. Alternatively, Defendants argue that there is no antitrust injury because any losses suffered as a result of the formation of Montell "would be the result of increased competition." *Id.* at 9.

▇▇▇ "[T]he antitrust laws ... were enacted for 'the protection of *competition*, not *competitors*.'" *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original)). Therefore UCC must allege that competition in general has suffered, not just that UCC itself has been harmed. Plaintiff's Complaint alleges the requisite harm. UCC alleges that "the Montell venture ... has and will substantially lessen competition" in the relevant markets (Cplt. ¶¶ 256–57); that as a result of Defendants' actions, "competition in the already concen-

---

**24.** All the cases Defendants cite in support of their position are appeals of grants of summary judgment, appeals after a jury verdict, or (in one case) a decision after a bench trial. None involves a motion to dismiss.

**25.** That section of the Clayton Act provides, in relevant part:

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18 (West Supp.1996).

trated Total Package License Market ... has been and will continue to be unreasonably restrained" (*id.* ¶ 241); and that competition in the Catalyst Market has suffered (*id.* ¶¶ 192, 242). UCC also alleges numerous overt acts by Defendants in furtherance of a "collusive scheme" to "lessen[ ] competition ... in the Total Package License Market" by "reducing the only significant competition for Spheripol" in that market. *Id.* ¶ 179. In addition, UCC charges that Defendants' goals were to "restrict output, increase prices, limit the introduction of advanced technology, realize supracompetitive profits, and ... harm competition." *Id.*

 Notwithstanding these allegations, Defendants argue that as a competitor, UCC stands to benefit from any lessening of competition and therefore lacks standing to challenge the formation of Montell. In *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 116–17, 107 S.Ct. 484, 492–93, 93 L.Ed.2d 427 (1986), the Supreme Court held that "competition for increased market share[ ] is not activity forbidden by the antitrust laws," and that the antitrust laws do not protect competitors from loss of profits due to price competition. Defendants correctly note that the *Cargill* decision "imposed significant barriers to competitor attempts" to challenge merger transactions, and "did not leave competitor plaintiffs a very good chance of having standing to enjoin mergers." *Community Publishers, Inc. v. Donrey Corp.,* 892 F.Supp. 1146, 1166 (W.D.Ark. 1995) (citing *Phototron Corp. v. Eastman Kodak Co.,* 842 F.2d 95, 102 (5th Cir.), *cert. denied,* 486 U.S. 1023, 108 S.Ct. 1996, 100 L.Ed.2d 228 (1988)). However, *Cargill* "has not rendered such attempts [by a competitor to enjoin mergers] impossible." *R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 110 (2d Cir.), *cert. denied,* 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). A competitor plaintiff has standing as long as it can demonstrate "that its injury was caused by anticompetitive or predatory aspects of [defendant's] conduct, not by competition." *Pacific Express, Inc. v. United Airlines, Inc.,* 959 F.2d 814, 818 (9th Cir.), *cert. denied,* 506 U.S. 1034, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992).

Assuming, as I must, the truth of Plaintiff's allegations, UCC has adequately alleged injury caused by the anticompetitive nature of Defendants' actions. Despite Defendants' attempts to distinguish the cases cited by UCC, those cases are similar enough to the instant case to support a finding that UCC has standing to challenge the formation of Montell. *See, e.g., Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252 (2d Cir.), *cert. dismissed,* 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989) (finding standing where target of an acquisition would lose independence because of injury occurring in the market; relied on in holding that a competitor-plaintiff has standing to challenge a merger in a market into which the plaintiff sought to expand (*see Bon–Ton Stores, Inc. v. May Dep't Stores Co.,* 881 F.Supp. 860, 878 (W.D.N.Y.1994))); *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 408 (1st Cir.1985) (competitor gas station owner had standing to sue based on "its allegations that the refined gasoline market has been harmed by [the merger] and that it will likely be 'squeezed' out of the market in the foreseeable future"); *Community Publishers,* 892 F.Supp. at 1165–66 (owners of competing newspaper had standing to challenge merger of two local newspapers because "any monopolistic increase in the combination's advertising rates would soak up all the available advertising revenue" and thereby "harm not only readers and advertisers, but also competitors"); *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.,* 600 F.Supp. 1326, 1331 n. 5 (E.D.Mich.), *aff'd,* 753 F.2d 1354 (6th Cir.), *cert. dismissed,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985) (plaintiff had standing where it showed "a substantial probability that if the proposed merger is accomplished and competition between [the merging defendants] is eliminated, then the combined firm would be able to target its competitive efforts on [plaintiff] and other small brewers. As a result of this merger, plaintiffs' ability to wholesale and distribute their products may be impaired, and ultimately, [plaintiff's] ability to survive in this industry of giants may be in question. This is exactly the sort of injury the antitrust laws were intended to prevent.") (citing *United States v. Topco Assocs., Inc.,* 405 U.S. 596,

610, 92 S.Ct. 1126, 1134–35, 31 L.Ed.2d 515 (1972)). *See also Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 783 (7th Cir.1994) (given two plausible interpretations of an antitrust claim, court chose one that afforded standing to the plaintiff and denied motion to dismiss for lack of standing because it was "premature" to draw conclusions regarding "the character of the loss that [plaintiff] seeks to recover").

The above-cited authorities provide ample support for finding that UCC has standing to challenge the formation of Montell. UCC has adequately alleged that competition has suffered as a result of the transaction, and that any harm suffered by UCC is the result of the anticompetitive nature of Defendants' actions. The motion to dismiss this count is denied.[26]

### XII. *Conclusion*

For the foregoing reasons, Defendants' motions to dismiss UCC's Third Amended Complaint are granted in part and denied in part. UCC's claim for breach of the implied duty of good faith and fair dealing (Count XIII) is dismissed. In addition, those portions of the claim for tortious interference with prospective contractual relations (Count VIII) which relate to prospective contractual relations with potential licensees of the UN-IPOL/SHAC technology, prospective contractual relations with Shell Canada, and expansion of the UCC/Shell Venture through Project Nautilus are dismissed. All other claims survive.

Although UCC has now amended its complaint three times, this is the first time that Defendants have moved to dismiss any of UCC's claims, and thus the first time that the Court has expressed its view on the sufficiency of the Complaint. Plaintiff may therefore have one opportunity to replead its claim for tortious interference with prospective contractual relations as it relates to prospective contractual relations with potential licensees of the UNIPOL/SHAC technology and prospective contractual relations with Shell Canada.[27]

SO ORDERED.

---

**26.** Defendants also seek dismissal of the "portions" of Counts IV and V that challenge the formation of Montell. Plaintiff maintains that the Court may not dismiss part of a claim, while Defendants argue the opposite. Because UCC has standing to challenge the formation of Montell, there is no need to resolve this dispute. No portion of Counts IV, V or VI will be dismissed.

In addition, Defendants contend that damages claimed by UCC on its antitrust claims are limited by certain statements UCC's counsel made during the preliminary injunction hearing in February 1995. Specifically, Defendants maintain that UCC is precluded from "recover[ing]

damages with respect to any claims that rely on assertions of 'uncertainty' or 'lack of confidence' among existing or potential licensees after the June 28, 1995 announcement that UCC would purchase the assets of SPC." Shell/Montell Mem. at 10. As stated earlier (*see* note 12, *supra*), a discussion of damages at this stage of the litigation is premature.

**27.** UCC may not replead that portion of the claim relating to the expansion of the UCC/Shell Venture through Nautilus because it is time-barred. Also, UCC may not attempt to cure the defect in Count XIII through repleading.